```
 1                 UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF TEXAS
 2                       AUSTIN DIVISION

 3   CATHI CLEVEN, TARA CLEVEN,    ) Docket No. A 16-CA-820 RP
     ARELI ARELLANO AND JOEL L.    )
 4   MARTINEZ, FOR THEMSELVES      )
     AND OTHERS SIMILARLY SITUATED )
 5                                 )
     vs.                           ) Austin, Texas
 6                                 )
     MID-AMERICA APARTMENT         )
 7   COMMUNITIES, INC., AS GENERAL )
     PARTNER OF MID-AMERICA        )
 8   APARTMENTS, LP, MID-AMERICA   )
     APARTMENTS, LP, INDIVIDUALLY  )
 9   AND AS GENERAL PARTNER OF     )
     CMS/COLONIAL MULTIFAMILY CANYON )
10   CREEK JV, LP AND CMS/COLONIAL )
     MULTIFAMILY CANYON CREEK JV LP ) November 2, 2017
11

12                 TRANSCRIPT OF MOTION HEARING
               BEFORE THE HONORABLE MARK P. LANE
13

14   APPEARANCES:

15   For the Plaintiff:        Mr. Britton D. Monts
                               The Monts Firm
16                             P.O. Box 164287
                               Austin, Texas 78716
17
                               Mr. Richard E. Norman
18                             Mr. Ronald M. Weber, Jr.
                               Crowley Norman
19                             Three Riverway, Suite 1775
                               Houston, TexaS 77056
20
                               Ms. Stacey V. Reese
21                             Stacey V. Reese Law PLLC
                               910 West Avenue, Suite 15
22                             Austin, Texas 78701

23                             Mr. Jason W. Snell
                               The Snell Law Firm, PLLC
24                             221 West Avenue, Suite 15
                               Austin, Texas 78701

25
```

```
 1   (Appearances Continued:)

 2   For the Defendant:        Mr. Barry Goheen
                               King & Spalding
 3                             1180 Peachtree Street, NE
                               Atlanta, Georgia 30309
 4
                               Ms. Katherine McFarland Stein
 5                             King & Spalding
                               500 West 2nd Street, Suite 1800
 6                             Austin, Texas 78701

 7

 8   Transcriber:             Ms. Lily Iva Reznik, CRR, RMR
                              501 West 5th Street, Suite 4153
 9                            Austin, Texas 78701
                              (512)391-8792
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Proceedings reported by electrical digital sound recording,
     transcript produced by computer.
```

```
 1              (Proceedings commence at 9:03 a.m. )

 2              THE CLERK:  The Court calls the following case for a

 3   motion hearing:  Cathi Cleven, Et Al vs. Mid-America Apartment

 4   Communities, Inc., 16-CV-820.

 5              THE COURT:  Good morning, everyone.

 6              Reminder you're in a magistrate's courtroom.  We don't

 7   have a court reporter, so it's incumbent upon you to have a

 8   microphone pointed towards your face if you want the recording to

 9   pick you up.

10              First order of business I'd ask you to do is introduce

11   yourself.  Tell me who you are, who you represent, and we'll

12   start over here on my left.

13              MR. WEBER:  Thank you, your Honor.

14              Marty Weber here on behalf of the plaintiffs and the

15   putative class, joined by Britt Monts, Jason Snell, Stacey Reese,

16   and Rich Norman.  And then, Kevin Jewell, an expert that is the

17   subject of the hearing this morning, is also with us in the

18   courtroom.

19              THE COURT:  All right.  Well, welcome everyone.  Please

20   have a seat.  Over here?

21              MR. GOHEEN:  Good morning, your Honor.

22              Barry Goheen and Katherine Stein representing the

23   defendants.

24              THE COURT:  Okay.  Thank you.

25              All right.  I've read what you have filed as it relates
```

1    to this motion to strike business.  I've gone back and looked a

2    little bit because I, frankly, hadn't begun to get prepared for

3    our certification hearing when this all blossomed, but I went

4    back and looked at some of that.  So I have some sense of what's

5    going on here.

6              I'm going to start over here with the defendants.

7    Here's what -- here's my understanding.  Plaintiffs have an

8    obligation to establish class ascertainability, right?  The way I

9    understand their argument is, they rely on the Ellsberry

10   deposition where he said this could be done, although he

11   acknowledges he's not an IT expert.  They file a motion for class

12   certification.  Y'all's response is -- and you're welcome to come

13   up.

14             Y'all's response is something along the lines of it's

15   not ascertainable, it's very difficult, have to go look at

16   individual tenant ledgers.  Plaintiffs respond by attaching

17   affidavits from experts saying, oh, that's not so, it can be

18   done.  It doesn't have to require individual assessments of

19   ledgers.  Forget about the law, forget about everything else,

20   that's the lay of the land.  What -- why shouldn't we make some

21   further inquiry into whether or not the software that's available

22   to your clients can produce the information that we need here?

23             MR. GOHEEN:  Well, your Honor, I guess to clarify the

24   facts, Mr. Ellsberry never said the class was ascertainable.

25   That's their argument, but that -- he absolutely did not say

1  that.  No way -- no.  He said I want to make sure that we're

2  clear on the -- step back to the class definition that they

3  proposed.  And the operative phrase is -- there is all tenants of

4  the MAA properties who were assessed and paid late rent charges.

5          THE COURT:  See, I saw "assessed."  I didn't see

6  "paid."

7          MR. GOHEEN:  That's in the class definition.  I mean, I

8  think they'll admit that.  That's in the --

9          MR. WEBER:  It is.

10          THE COURT:  I was just looking at it this morning.  The

11  statute seems to be just if it's assessed.  I didn't even see if

12  it was paid.  But putting that aside, go ahead.

13          MR. GOHEEN:  But that's the important point, the "and

14  paid" part.  And we agree and Mr. Ellsberry testified that their

15  IT program could identify those as individuals who had been

16  assessed late fees.  What he didn't say and what he actually said

17  could not be done is to identify those individuals who had

18  actually paid those charges, and that's what is necessary under

19  their class definition.

20          And, again, there's not going to be any dispute about

21  that, either.  They tried.  They tried six or eight times in the

22  deposition to say, well, can this -- and the answer was always

23  no.  That's why he sent -- that's why the affidavit was submitted

24  with our class cert response to clarify that yes, and it was

25  admitted in the affidavit, as well.

1          The Yardi program -- and that's the IT program we're

2   talking about -- can actually be programmed -- and we've done

3   that -- to spit out a program that will display those that were

4   assessed, but it will not -- just, you know, it's software

5   limitation, it cannot be engineered due to data limitations to

6   allow the generation of those who paid.  So the net charges are

7   not knowable at that level.

8          THE COURT:  So let me see if I understand this.

9   Plaintiffs say yes, you can.  Y'all say no, you can't.  You can't

10  write a program that can produce the names of these people who

11  not only were charged but paid.  And I'm going to get a battle of

12  experts, and then, what am I supposed to do?

13         I mean, there's a part of me that says, why don't I

14  order the defendants to provide to the plaintiffs four years'

15  worth of the Yardi data, or at least the apartment complexes that

16  the named plaintiffs are in, and if their expert can write the

17  program within -- if they can -- you know, if I give them 30 days

18  to do it and their expert can write the program, then we know

19  it's doable.  And if the plaintiffs' expert can't write the

20  program, then you've been bolstered, if you will.  Your argument

21  is a good one.

22         Why isn't that an easy, simple way to determine whether

23  or not that software can generate these names?

24         MR. GOHEEN:  Well, the first answer to that is, why

25  wasn't this done months ago?  That's why we're here today.  It's

1   not to determine what in my -- respectfully submit, that's not

2   why we're here today.  We're here today because they untimely

3   disclosed experts.  That's the problem.  They had an expert.

4   They disclosed an expert on exactly these issues, Otto Wheeler,

5   and guess what, he bombed in his deposition.  That's why they had

6   these two people that came in late.  That's just the bottom line.

7   They had an expert and we deposed them and he was abso -- he was

8   on the issue of ascertainability, the very issue we're talking

9   about right now, and class member damages.  He was on those two

10  issues.  But in his deposition, he said, well, to understand the

11  class member damages, that would take a tenant-by-tenant

12  analysis.

13          And, also, with exclusions, which is their other guy,

14  Prutsman, who I think they've kind of disregarded at this point.

15  He's not even part of their argument for -- most part, but class

16  action administrator said, well, for exclusions such as

17  bankruptcies and releases and all that, we can run some sort of

18  national search.  Well, they had the expert timely disclosed in

19  June.  We followed the scheduling order and they didn't.  That's

20  the reason we're here today.  Not to argue whether the class is

21  ascertainable.  That's been briefed.  That's the problem and

22  that's the prejudice to us to have to go depose two more experts

23  that they untimely disclosed because their own expert bombed in

24  his deposition.  That's why they should be stricken.

25          This isn't -- you know, respectfully, this is not about

1  whether the class is ascertainable.  They're going to have a big
2  dog-and-pony show to argue exactly that point, even though the
3  Court's order said we're not going to have witnesses or arguments
4  on class cert today.  That's the reason they should be stricken,
5  your Honor.  It's untimely.
6       THE COURT:  And I think that is your best point,
7  frankly, and as it relates to this case.  But I do wonder
8  sometimes if I go your direction on this and they move to
9  voluntarily dismiss the lawsuit and then, file another one,
10  aren't we right back to where we are right now?  Maybe that --
11  unless the defendants have changed the way they assess late fees
12  to in a manner that the plaintiffs find satisfactory or not, I
13  don't know.  Whether that shrinks the damages period.  Aren't we
14  right back to where we are?
15       MR. GOHEEN:  They're not going to -- A, your Honor,
16  they're not going to do that.  B, I think there should be
17  conditions on a voluntary dismissal, which is clearly something
18  the Court can do under Rule 41.  I mean, so they're not going to
19  -- perceptively speaking, they're not going to voluntarily
20  dismiss a year and a half into the case.  But the Fifth Circuit
21  cases, which they don't even hardly respond to in their brief,
22  are exactly on point.
23       Sierra Club, Harmon, Hamburger, Geiserman, all of those
24  were Fifth Circuit cases where there were late expert reports in
25  violation of a scheduling order, the district court excluded

1   them, or maybe didn't, but regardless, each of those cases, the

2   Fifth Circuit said yes, the sanction of exclusion is absolutely

3   appropriate under these circumstances.  I mean, that's the law

4   and that's why we're here, not for them to have a diversionary

5   argument on how the class is ascertainable and how their theory

6   of the case and all that sort of stuff.

7           Here's a prediction.  They're going to pull up --

8   they're going to put up this PowerPoint in a minute.  You're not

9   going to see the name Otto Wheeler on it.  That's their expert.

10  That's the one they disclosed.  Not Kevin Jewell, who put in a

11  placeholder, and we've cited a case where that's inappropriate in

12  the Fifth Circuit.  Not a class action administrator.  They've

13  had their chance.  They've had their chance, your Honor.  They

14  did not come through.

15          Well, they had an expert who just bombed, quite

16  honestly, and that's not the purpose of the expert rules.  You

17  can't -- you don't get another chance.  This is untimely.  It's

18  unfair.  It's -- besides the obvious cost, including coming here

19  today if we have to depose them and that's also a significant

20  factor.  I mean, the four-factor test of Sierra Club, they make

21  no effort to apply in their papers.  None whatsoever.  Is there a

22  plausible explanation?  No, there's not.  They're setting up a

23  red herring with Ellsberry, who never testified that the class

24  was ascertainable.  Numerous, yes.  Ascertainability, no.  Those

25  are two separate things that they're trying to combine, and

1  they're going to do it again in a minute, I guarantee you.

2          So that's not appropriate.  Obviously there's

3  prejudice.  Curing the prejudice is a sanction.  A continuance

4  doesn't incent future compliance with scheduling orders.  I mean,

5  it just doesn't.  And that's -- again, those are -- that's right

6  out of the Fifth Circuit cases.  That's the law.  There's just an

7  abundance of authority, including judges in this court we've

8  cited just this year, Yeti and many other cases, again, right on

9  point, late expert reports and they're just stricken.

10          I mean, at the absolute bare minimum, your Honor -- and

11  I know this was not your Honor's.  This was the district judge

12  when they wanted to take and they felt they were getting the

13  runaround by prior -- the prior counsel and taking the 30(b)(6),

14  what Judge Pitman did was require that the deposition be taken in

15  Austin, even though Mr. Ellsberry's in Memphis, at their

16  convenience.  At the absolute bare minimum, the sanction, if not

17  exclusion, should be them producing in Atlanta at our convenience

18  so the -- to mitigate the cost we've had.  I think at a bare

19  minimum, that would be a fair resolution.  But the Fifth Circuit

20  would have required these to be stricken, your Honor, in my

21  respectful opinion.

22          THE COURT:  You make in my opinion good points, and I'm

23  going to hear from the other side and I'll think about them

24  because I'm not going to rule from the bench today.  But let's

25  say I ruled against you.  Besides Atlanta, is there an effective

1    way?  I mean, I'm a layman as it relates to these software

2    programs and whatnot.

3            MR. GOHEEN:  So am I, your Honor.

4            THE COURT:  Okay.  Well, I think many of us probably

5    are with the exception of maybe Mr. Jewell back there.  But, I

6    mean, that's my kind of -- I don't know if you'd be giving up

7    state secrets by giving them, you know, the Yardi software data

8    as it relates to maybe two or three of these complexes, and if

9    they can write the software, then we know it's writable and they

10   can give you the code that they produced.

11           I mean, I'm almost -- I've got the plaintiffs saying

12   that could easily be done.  I've got the defendants saying it

13   can't be.  But my gut reaction is to say, okay, plaintiff, put up

14   or shut up.  You hire the expert, you find out if the code can be

15   written that can give you the information you want.

16           MR. GOHEEN:  Well, your Honor, here's the issue with

17   that and this shouldn't be a Daubert hearing or anything like

18   that.  But his affidavit was about the worst affidavit I've ever

19   seen.  I mean, under his affidavit, all that he said was, well, I

20   called two people who said it could be done.  He didn't say it

21   could be done --

22           THE COURT:  No.  I agree.

23           MR. GOHEEN:  -- based on his independent research.  All

24   he did was look up the Yardi website, he looked up an independent

25   consultant for Yardi and said, well, here's what the website

1    says.  He's a layman, too, in my opinion, no more than I or

2    anyone anything else in the room so --

3            THE COURT:  I know it seems like I'm beating up on you,

4    but I'm going to beat up on them here in a minute.

5            MR. GOHEEN:  Okay.  Thank you, your Honor.

6            THE COURT:  I tend to agree with you.  All right.

7    Well, I kind of tend to jump into right what interests me.  Is

8    there anything else that you wanted to share with me?  And I'm

9    not trying to cut -- we've got all morning.  So.

10           MR. GOHEEN:  No.  Yeah, I believe I've made the points.

11   I appreciate your Honor's questions and they're good questions.

12   I'm not trying to minimize their significance.

13           At the same time, we fully believe that this is -- the

14   Sierra Club test is simply not met and this is, again, a red

15   herring to obscure what Mr. Ellsberry did and did not testify to.

16   There are two components of this class definition:  Assessed and

17   paid.  Assessed, everybody agrees it can be done.  We're saying

18   it can be done.  Paid, nobody has said -- at least up through our

19   class response, which was our one shot at it, nobody said it

20   could be done.

21           Now they're trying to undo all of that and I believe

22   there's the next issue of fundamental fairness to us.  We had our

23   record, we deposed a one timely-disclosed expert that he said

24   what he said, and we relied on that in our class cert response.

25   We just don't believe it's fair to give them a Mulligan and say,

1   well, let's bring in two other people and sweep our first expert

2   who bombed in his deposition under the rug.  Just believe that's

3   not compliant with Fifth Circuit law, your Honor.  Thank you for

4   your time, though.

5           THE COURT:  You're welcome.

6           MR. GOHEEN:  Appreciate it.

7           Is it Mr. Weber?  Is that it?

8           MR. WEBER:  Morning, your Honor.

9           THE COURT:  Why isn't he right?

10          MR. WEBER:  He's not --

11          THE COURT:  I mean, why isn't -- I mean, the reality is

12  Wheeler bombed.  We all know he did.  Jewell cites other hearsay

13  in the late responses -- or not the late response but the reply

14  brief.  I'm sorry, the response.  And if the rules mean anything,

15  y'all didn't get it done by the time you needed to get it done.

16  Why isn't that a fair criticism?

17          MR. WEBER:  It's not a fair criticism, your Honor,

18  because Rule 26 and Rule 37 permit what's happened here.  And if

19  I can address in sort of a sequential fashion how we got to this

20  point.  Because a lot happened before Mr. Goheen and his firm

21  joined this case.

22          And, specifically, there were multiple hearings in

23  front of Judge Pitman that postured the case in a specific way,

24  specific information being provided on a specific timeline.  And

25  what the defendants argued before Mr. Goheen's firm joined it

1    was, they wanted to provide a certain amount of data on the front

2    end.  They didn't contest numerosity.  They didn't contest that

3    you could identify specific people.  In fact, they told Judge

4    Pitman, we know who these people are and we can find them.

5           For purposes of numerosity, you're not just counting

6    individuals that are walking down the street.  You're counting

7    individuals who meet the class definition.  And what the prior

8    counsel told Judge Pitman was, we know who those people are and

9    we can tell you, Judge, who those people are.  What they said and

10   what they've told Judge Pitman was, we don't want to go through

11   the level of granular data producing that on the front end.  It's

12   going to take some time.  We can do it, but we don't want to do

13   it now.  We're not going to contest numerosity.  We represent to

14   the Court that we can identify these people.  That's going to be

15   an uncontested issue.

16          That was the fact pattern and those were the documents

17   that were placed in Mr. Wheeler's hands for purposes of his

18   deposition.  At his deposition, what he testified to when he said

19   this in his report, as well, he said, my understanding is the

20   parties have agreed with the Court there's going to be additional

21   granular data provided later on.  What I can say right now on the

22   basis of the data that I have in front -- and this is uncontested

23   by the defendants because even Mr. Ellsberry says it.  If you

24   look to a tenant ledger and a tenant ledger is a summary of

25   information that is maintained in the Yardi database, you can

1    tell what the charges were, you could tell whether they were paid

2    or not, and you could tell if they were waived or not.

3             And so, on that -- the basis of the tenant ledger,

4    which was the scope of information that Mr. Wheeler had it for

5    purposes of his deposition and Mr. Ellsberry testifying in his

6    deposition that you can look to the tenant ledger.  We know this

7    information.  We know what fees are paid.  We know what fees are

8    waived.  We know --

9             THE COURT:  Tenant ledger as in the manual ledger or

10   the digital ledger?

11            MR. WEBER:  It's the digital ledger that pulls up -- if

12   you imagine Yardi as a giant database that maintains all these

13   data points, maintains journal entries for every charge and every

14   payment, that's maintained in the database.  The tenant ledger

15   extracts information out of that database and in a summary form

16   for each individual tenant, places that information on their

17   tenant ledger.

18            So, for example -- and I apologize because I want to be

19   able to show the Court this and my computer is -- if you'll just

20   give me just a moment, your Honor.

21            THE COURT:  Sure.

22            MR. WEBER:  On the tenant ledger, it identifies -- we

23   gave the Court a hardcopy of the presentation, your Honor.

24            THE COURT:  Yes.

25            MR. WEBER:  I believe that I've given away all the

1    copies.

2           In the tenant ledger, there's a specific slide that

3    talks about Cathi Cleven and it has her tenant ledger.  She has a

4    specific identifying code.  Every tenant at every apartment

5    complex is assigned a code.  That code tracks every journal entry

6    that goes into the database.  So when she makes a payment,

7    there's a record that shows she made a payment.  When she's

8    charged or assessed a fee, it's -- there's a specific fee

9    assessment that has a journal code that's attached to it.

10   Initially, and in response to Judge Pitman's order, ordering them

11   to provide information, the defendants produced over 8,000 pages

12   worth of spreadsheets that list every charge for a late fee to

13   every tenant at every property.

14          So they gave us already one half of the ledger.  They

15   gave us the charge side of the ledger.  Corresponding journal

16   entries when you look to the tenant ledger, it has a journal

17   entry.  When you look to the massive spreadsheet, you can use the

18   tenant code, find that code, that charge, then you could

19   correspond to every fee that's assessed.  That's maintained in

20   the database.

21          What they said and what they represented to Judge

22   Pitman was -- for purposes of prior to the hearing, they did not

23   want -- they did not want to provide the other side of the

24   ledger.  They didn't want to go through the process of extracting

25   the payment side of the ledger.  Not that it can't be done but

1   that they didn't want to do it at that time.  Because if you

2   travel back in time, a few months before Mr. Goheen got here,

3   nobody was contesting ascertainability.  They have a record of

4   every charge and a record of every payment.  That's all Mr.

5   Jewell is saying.

6           If you give me the opportunity, what Mr. -- I can

7   demonstrate that what Mr. Ellsberry is saying is incorrect.

8   Until the time of the hearing -- excuse me, until the time of

9   their response, they had never taken the position in this

10  litigation that you couldn't find the information.  They had

11  taken the position that they didn't want to.  So for purposes of

12  -- for purposes of where we were for Mr. Wheeler, he simply said

13  for purposes of ascertainability, I could ascertain the class.

14  And I want to pause here for a second, your Honor, because this

15  is an important issue.

16          Ascertainability is not the bar that the defendants say

17  that it is.  Ascertainability does not require that we, in fact,

18  go through the process of having one summary spreadsheet that we

19  can look to.  Numerous courts, numerous courts, even courts in

20  which Mr. Goheen has been counsel, have stated that the issue of

21  ascertainability does not require that you have one simple

22  summary spreadsheet.  We may have to do some work ultimately.  If

23  you had to do a tenant-by-tenant ledger review in order to see

24  what fees were charged, what fees were waived, and what fees were

25  ultimately paid, that provides you the level of information you

1   need to establish ascertainability.

2            Ascertainability is not looking at whether you have to

3   do some work, whether there's some labor involved.  Courts are

4   very specific that that's not the bar.  The defendants are

5   setting an artificially high bar.  They want to say, unless you

6   can cobble all of this information together on one spreadsheet,

7   you can't prove ascertainability.  That's simply not the test.

8   Mr. Ellsberry said we can go to the ledger and we can sort this

9   out.  Mr. Wheeler said on the basis of the information I have, we

10  can go to the ledger and we can sort this out.  We can tell if a

11  tenant paid late fees.  We can tell if a tenant didn't pay late

12  fees.  That provides the objective proof we need in order to

13  support ascertainability.

14           We could have stopped there, quite frankly.  We could

15  have simply said when they brought forward Mr. Ellsberry, who

16  said we can't put together only one spreadsheet to show this

17  information, we could have said in our view, and we did say and

18  we did argue in our reply brief, that it's a false test that

19  they're setting.  That what Mr. Ellsberry is saying in this

20  limited point doesn't matter.  Even if we can't pull it together

21  in one spreadsheet, we can still establish ascertainability in

22  the case.  We can still identify these people.

23           Well, we didn't want to stop there because what Mr.

24  Ellsberry said in his declaration, we believe, is demonstrably

25  false.  He's saying Yardi does not have this capability and we've

1  identified people who know Yardi.  Mr. Ellsberry said in his

2  deposition, he wasn't an IT expert.  We've talked to, identified,

3  worked with IT experts who have done this on a repeated basis,

4  and they say you can write the query.

5        So we brought forward the information for this court

6  that has to conduct its rigorous analysis of all the Rule 23

7  elements and simply said we think -- and we know that we can

8  establish ascertainability, but we want to point this out.  What

9  they're saying, even if this artificially high bar is the test,

10  which it isn't, but even if it was, we can still do it.

11        So why should we be permitted to do it and do the rules

12  allow it?  The rules do allow it.  Rule 26 says that when you

13  have a docket control order that doesn't specify rebuttal expert

14  deadline, you have 30 days.  When Mr. Ellsberry stated, even

15  though he wasn't qualified, when he stated that under Yardi,

16  Yardi doesn't have the technical capability to do this, it just

17  can't be done, our clock started ticking, and in less than 30

18  days, we produced a report from an expert who said yes, it can be

19  done.  So --

20        THE COURT:  Which report is that?

21        MR. WEBER:  The Jewell declaration.  And in the Jewell

22  declaration, as an expert --

23        THE COURT:  But why didn't you get declarations from

24  the two guys that Jewell cites?  I mean, they're the experts.

25  Jewell really isn't.

1          MR. WEBER:  We're -- for purposes of an expert, an

2   expert is -- and Mr. Jewell has testified as an expert in

3   multiple cases in which identification and calculation of damages

4   was the issue.  For example, in the debit fee litigation that Mr.

5   Jewell was involved in, they had to go through thousands and

6   millions of lines of data from banks trying to see who was

7   assessed fees and going through the databases, were assessed

8   fees, who were not assessed fees.  He does have the -- he does

9   have the background and experience to provide that information.

10          And, in addition, experts are entitled and allowed to

11   rely on information from outside sources routinely relied on.

12   And people like Mr. Jewell routinely rely on people who have

13   specific database expertise, and that's who he reached out to.

14   Speaking to other people, just as an expert is entitled to do

15   under the rules to rely on other people that they would

16   ordinarily consult with and to obtain the information.

17          And we agree with you, your Honor.  We think if they

18   produced 30 days of information, based on the information we

19   have, we can do that.  We can write that code.  What we're saying

20   now is -- and sort of a very limited fashion for purposes of this

21   hearing, all we're saying now is, what Mr. Ellsberry said in his

22   declaration is false.  He says you can't do it, even though he's

23   not an IT expert, he was providing technical information for this

24   court to rely on.

25          So under 702, this court at some point is going to

1    analyze whether Mr. Ellsberry even has the capability of saying

2    it can't be done, whether he's qualified to say it.  But under

3    Rule 702, he was proffering to the Court technical expertise

4    about the capabilities of the Yardi database system.  We went out

5    and retained an expert to rebut that one limited point of the

6    technical capabilities of Yardi.  This court is obligated to

7    conduct the rigorous analysis, and we believe it ought to be done

8    on the facts.

9            And what Mr. Goheen would not acknowledge to the Court

10   is, he's going to do everything in his power to ensure that we

11   don't get the information to demonstrate that our expert is right

12   in his declarants is wrong.  And so, for purposes of Rule 26,

13   Rule 26 specifically permits the rebuttal expert.  There was no

14   docket control order on rebuttal experts.  The rule says the

15   30-day deadline applies, so we meet that test.

16           Alternatively, the Jewell declaration should be

17   permitted under Rule 37, your Honor.  Rule 37 says that the

18   motion to strike might be granted unless the failure was

19   substantially justified or is harmless.  The four-part test was

20   recently laid out in Betzel vs. State Farm Lloyds, which is a

21   Fifth Circuit 2007 case.  The four-part test, the importance of

22   the witness' testimony, this court is going to have to conduct a

23   rigorous analysis of whether we can ascertain people.  We believe

24   that that's important testimony.

25           The fourth factor is the explanation for the party's

1   failure to comply with the discovery order.  Your Honor, for

2   purposes of what has transpired in this case, everything that led

3   up to us filing our motion for class certification definitively

4   led everyone in litigation to know that we could identify these

5   people.  That we could see who was assessed fees and we could see

6   who was paid fees.  You can look to the tenant ledger and you can

7   identify that information.

8          They were telling a federal judge that they could

9   identify these people and they could count them.  We felt that

10  that was information that we could rely on for purposes of our

11  motion for class certification.  When they suddenly changed

12  course in the middle and start saying, we can't identify these

13  people, we only know who we charged, but we don't know who we

14  collected money from, and if you pause just on that notion for a

15  second, that's really the crux of what they're telling you.

16         They say that we could pull together a summary report

17  of charges, but we can't pull together a summary report of who

18  paid us.  That's absurd for a billion-dollar company, your Honor,

19  that they only care about charges, but they don't care about

20  revenue?  That would be like a lawyer who says, I only care about

21  how many hours I bill, but I don't care about collections.  I

22  mean, no lawyer thinks like that.  And no multibillion-dollar

23  company that makes its money off revenues thinks like that.

24  They're tracking both sides of that.  That's how general ledgers

25  work.  It's -- I mean, as long as they're following generally

1   accepted accounting principles and I've got to work from that

2   basic assumption.

3           So they know both sides of that equation.  And so, for

4   purposes of what we believed we had in the information that we

5   had, nobody was contesting we could identify these people.  Mr.

6   Ellsberry pops up in their response and says, we can tell you who

7   we charged, but we can't tell you who we collected money from.

8   And focusing just laser-focused on that, I believe that's false,

9   and we believed it was necessary for purposes of the record to

10  demonstrate that was false.  That's what prompted us to get the

11  Jewell declaration.

12          And our explanation for why we didn't do it before is,

13  until Mr. Jewell said that the we can't know who paid us, we just

14  know who we charged, we believed that the record was demonstrable

15  -- was definitively clear on that point.  I mean, based on

16  representations to, among other people, Judge Pitman, and we

17  thought and we believed and we've attached that to our class

18  certification.  We believe the record is very clear on that

19  point.

20          Most importantly, and I believe this gets to what the

21  Court was talking about earlier for purposes of 30 days and

22  additional information, Betzel vs. State Farm Lloyds clearly said

23  when you're focused on whether we should strike an expert.  In

24  that case, the district court had stricken what it believed to be

25  a late designated expert.  The Fifth Circuit said we're really

1  looking to the prejudice.  The prejudice of can we grant a

2  continuance, can we deal with this if we give people a little

3  extra time to deal with what might otherwise be a designation out

4  of time or a late designation.  Fifth Circuit said this:  What

5  prejudice remains could have been cured with a continuance.

6  Indeed, we have repeatedly emphasized that a continuance is the

7  preferred means of dealing with a party's attempt to designate a

8  witness out of time.

9          So even if they needed a continuance and they needed --

10 and they believed they need additional time maybe to get somebody

11 to respond to Mr. Jewell, the appropriate approach here would be

12 additional time on both sides.  I would say, your Honor, that

13 they've had plenty of time.  We designated Mr. Jewell at the end

14 of August.  With his designation and with the tendering of his

15 report, responding to Mr. Ellsberry's one statement, one

16 contested statement, we sent over deposition available dates for

17 early September.  We didn't hear from Mr. Goheen and his firm on

18 that point until they filed their motion to strike.

19         We had Mr. Jewell set for his deposition yesterday.  We

20 thought the class certification hearing was going to be today, so

21 last week, Mr. Goheen asked for the deposition.  We made

22 arrangements for Mr. Jewell to be available yesterday.

23         To the extent they believed they need to depose Mr.

24 Jewell in order to be able to make arguments regarding his

25 ability to proffer this testimony, we've given them multiple

1    opportunities.  The Court's now continued the class certification

2    hearing for purposes of having this hearing today.  That provides

3    additional time.  We'll, of course, work with the defendants to

4    present Mr. Jewell.

5              But we believe that the Court's leaning in regard to

6    the easiest way to solve this and, quite frankly, the easiest way

7    to get to the Court, and I think that ought to be everybody's

8    goal here, which is, let's decide this case on what they

9    factually are, not what the plaintiffs think they might be, not

10   what Mr. Ellsberry might assert that they are, but let's decide

11   this on the facts.  We absolutely meet ascertainability, anyway,

12   but we believe that this additional information will be helpful

13   to the Court, and we believe the Court's suggestion is a good

14   one.

15             We'll, of course, make accommodations.  If they need us

16   to appear somewhere, we'll work with them.  We've always wanted

17   to work with defense counsel in this case.  We've had a much

18   smoother relationship now that Mr. Goheen's firm has joined.  We

19   haven't -- exception of this, I think this has been our first

20   hearing.  But we had sort of a turbulent road leading up to Mr.

21   Goheen's firm that led to a bunch of hearings in front of Judge

22   Pitman, as the Court can see from the record.

23             THE COURT:  I have a feeling that's what led to this

24   being sent down here.  So that's your penalty for that.

25             MR. WEBER:  But we believe under Rule 26 and under Rule

1   37, we meet the test.

2          And I do need to address this in regard to the Prutsman

3   declaration.  The Prutsman declaration simply speaks to what can

4   a class administrator.  If this court certifies the case on

5   contested basis, notice is going to have to go out to every

6   member of this class.  The Court is going to order the defendants

7   to produce information as to who's in the class.  We can do that

8   cooperatively.  We'll work with them, as well.

9          But a class administrator ultimately is going to give a

10  spreadsheet with addresses and send those out to the class

11  members for purposes of notice.  Class -- so the capabilities of

12  what a class administrator can do is important.  A class

13  administrator maintain databases on bankruptcy filings.  They

14  know they can take the class list, they can run it against

15  information in their maintained databases and exclude people who

16  have filed for bankruptcy.  I will tell you that even that level

17  -- and I've done class actions for a long time.  Even that level

18  of detail is a unique argument that the defendants are making

19  here.

20         What routinely happens and what has even happened in

21  this courtroom in multiple cases and class actions that we've

22  certified over the last year or so in this court, even one

23  against MAA, and in that case, MAA had a class definition and

24  that case involved a class definition that was assessed and paid.

25  It was the exact same language we have here.  It dealt with water

1  fees, but not late fees.  When ordered by the Court, MAA was able

2  to go out and identify for purposes of the Schilling case those

3  people who were both assessed and paid the fees.  So they've done

4  it one time, experience in this courtroom or in this courthouse.

5         But for purposes of what would ordinarily happen,

6  ordinarily you would identify those people that meet the core

7  class definition, and you're not worried about finding those

8  people who meet the exclusions because the class notice goes out

9  and it says you're a remember of the class if you meet the class

10  definition and if you don't fall within one of the exclusions.

11  For example, if you're going to receive a check or you're going

12  to be able to submit a claim form, you're -- you need to look at

13  the exclusions, and that's disclosed in a class notice to the

14  defendant -- or to the class members.

15         So the class members are self-identifying for purposes

16  of the exclusions.  The defendant, in conjunction with the

17  plaintiff and working with the class administrator, identifies

18  those people who meet the core class definition, which here would

19  be who lived in apartment complexes and who were assessed and

20  paid the late fees.

21         So for purposes of the assessed and paid language

22  tripping them up in this case, it didn't trip them up in

23  Schilling, and they were able to comply with the Court to produce

24  that information.  We think when things get drilled down a little

25  bit in this case, this information is there.  Every

1   revenue-generating company maintains both sides of that ledger,

2   your Honor.

3          THE COURT:  Okay.  Mr. Goheen, I mean no disrespect,

4   but I'm hot up here.  So I'm taking this off and if you don't

5   mind.

6          MR. GOHEEN:  May it please the Court, I'll try to be

7   brief.  There was a lot of misstatements to get to.

8          First of all, it looks like we're going to have to

9   depose four people.  So that just adds to the cost the two

10  mouthpieces for Mr. Jewell, which was pretty much admitted.  So

11  that kind of just compounds the cost.  If it was -- why didn't

12  they move for leave with the reply brief?  That, to me, would be

13  the logical thing to do.  Just move for leave and then, we tee it

14  up months ago, not just --

15         THE COURT:  Well, we did -- my staff and I, we talked

16  about that.  That might have been the better way to go about

17  this.  But if they had, let's just pretend we're two months ago,

18  three months ago, I still have to make the decision.

19         MR. GOHEEN:  Correct.  But that would -- we would have

20  the decision two months ago, presumably, and all this delay that

21  they're working into the case would still be unnecessary.  So I

22  guess regard you get a little bit of ascertainability.

23         But the standard that goes back to DeBremaecker, which

24  is the leading case from the Fifth Circuit out of Texas in 1970,

25  the class definition must be objectively ascertainable.  We agree

1  that the assessed part is objectively ascertainable.  Mr.

2  Ellsberry -- and you didn't see anything in their PowerPoint

3  about from his deposition that said, oh, yeah, we can determine

4  who actually paid.  He can't -- he never testified to that.

5  They're just making this up.  They just --

6            THE COURT:  Can I digress for a second?

7            MR. GOHEEN:  Absolutely.

8            THE COURT:  I'll share with you a concern that I have.

9            Again, I've admitted to you that I'm not -- I'm a

10  layman as it relates to computer stuff.  And as you have probably

11  gleaned, I'm a layman when it comes to class certification

12  issues, too.  But putting that aside for a second, it just --

13  there's a part of me that just defies common sense that a

14  company, big or small -- but let's face it, this is a big one --

15  that has a software program -- I mean, I've been around software

16  programs in different contexts before I got this job.  I'm just

17  -- I just think it would be simple to write this code and if --

18  and maybe not -- "simple" is the wrong word, but they're capable

19  of doing it.

20            I mean, when at the end of the year, when whatever the

21  main company is here, Mid-America is putting together their

22  balance sheet and their income statements and all the other

23  material they have to, aren't they going to have a line item for

24  late fees received as part of their revenue stream?

25            And so, I come at this thinking this is kind of a

1   no-brainer and I find -- I'm a little sympathetic with the

2   plaintiffs' posturing and I need to go back and read all of

3   y'all's hearings before Judge Pitman.  I got a sense of it.

4   There was trouble through that time, but everybody was kind of

5   operating under the assumption that it is a no-brainer, that it's

6   quite capable of being done.

7          And now, as I understand your argument -- and, again, I

8   told you I thought it was a fair one -- is I should just --

9   because they didn't follow the rules exactly, even though they

10   contest they say they did, I should not allow them to go into or

11   produce other expert testimony on this point.  And I just don't

12   know if that's the right thing to do.

13          MR. GOHEEN:  Now, here's why it's a red herring.  Why

14   didn't they have a rebuttal report of Wheeler?  That was the one

15   person they timely disclosed.  Why didn't they have him?  And

16   just as I predicted, you didn't hear Otto Wheeler's name one time

17   up here.

18          THE COURT:  Well, he did kind of say that Wheeler.

19          MR. GOHEEN:  Bombed.

20          THE COURT:  He said it was ascertainable, but he was

21   relying a little bit on y'all's rep -- your -- earlier counsel's

22   representations that I think the term y'all used is "granular

23   data" would be produced at a later date.

24          MR. GOHEEN:  He didn't actually say that in his

25   deposition.  They said that.  But he just said it would be a

1  tenant-by-tenant analysis.  But regardless, that would be the

2  easiest thing to do.  And the next easiest thing to do, why not

3  depose an IT person at MAA?  Why use somebody who has absolutely

4  zero experience in Yardi?  Because he pretty much admitted it

5  just to call up people and say, well, I guess it could be done

6  because someone that's actually a partner said it could be done.

7  That's crazy.  I mean, all that's going to do is guarantee

8  Daubert practice.  It's going to delay things further before we

9  even get to class cert.  I mean, that's exactly what's going to

10 happen here.  I mean, that just is inappropriate.

11          I mean, we should have, I guess, moved to strike him on

12 the, quote, unquote, merits, the term I use loosely, just because

13 it's not an expert report.  And I wanted to -- this is what he

14 actually submitted in June with their class motion.  He submitted

15 what, in effect, was a placeholder report.  He didn't have any

16 opinions, but he did say what he'd been retained to do.  I've

17 been retained by counsel for the plaintiffs in Cleven, la, la la,

18 to present expert testimony.  I expect to analyze and provide

19 opinions regarding the estimation of damages that defendants,

20 from what I understand from counsel, are presently working to

21 prepare.  This is in June.

22          The only notification we received then was that he's

23 going to be on estimation of damages after our expert concludes

24 its work, which is, of course, a merits issue.  There was never

25 any hint that he was going to be some sort of expert on

1   ascertainability.  That's completely new here, has nothing to do

2   with Mr. Ellsberry, has nothing to do with the deposition.  I

3   mean, that's just out of whole cloth in August.  That -- they

4   notified the Court in their papers that he's not an expert, he's

5   not going to be an expert on Yardi or IT.

6           They should have just deposed an IT person of MAA if

7   they're that curious about it.

8           THE COURT:  But that's a level of expertise that you're

9   demanding.  I mean, they're moving forward under the assumption

10  that, as I characterized it, a no-brainer that this is easy,

11  their damages expert, he can do his job because it's simple for

12  the defendants to not only determine who was assessed but who was

13  paid.  And now -- and in fairness to them, there was never a red

14  flag that I could see that that was not -- "easily" is probably

15  the wrong term, but capable of being done without too much of a

16  burden until kind of the 11th hour.

17          MR. GOHEEN:  I guess I'd respectfully disagree because

18  Mr. Ellsberry testified -- this is in our reply brief.  The

19  summary information that allows the assessment did not include

20  waives or credits.  That's where you get to the net.  That's the

21  paid.  And that, quote, transaction level -- transaction level

22  credits and debits are recorded on individual resident ledgers.

23          We didn't know -- go back to this case.  The Clevens

24  and the Arellano, Martinez, the two sets of plaintiffs here, we

25  didn't know all of their nets and, frankly, the plaintiffs

1  didn't, either.  If you look at their initial disclosures, they

2  were way off until we actually deposed them.  And that's what

3  we're talking about.  I mean, if they want to have an action of

4  thousands and thousands of people that you can go to the resident

5  ledgers, that's not a class action.  That's thousands and

6  thousands of cases jammed together under the guise of a class

7  action.

8           THE COURT:  Because you say on behalf of your clients

9  that that's the only way that information can be obtained.

10          MR. GOHEEN:  Well, if that's the way it is, that's it,

11  your Honor.  I don't --

12          THE COURT:  I know, but why don't -- you're saying

13  plaintiffs should just take defendants' words.  That's -- the

14  defendants' word has to be tested, I think, here.  If the

15  defendant is right, well, then, you're going to win on

16  ascertainability.  But if there's a way to write some code and

17  get this information without too much of a burden, I'm just --

18  I'm not persuaded.

19          All right.  Here's what I'd like to do.  I've changed

20  my mind.  You all grab separate podiums here.  You grab that mic,

21  if you don't mind, Mr. Goheen, and, Mr. Weber, you grab that one.

22  All right.  We're going to do something here and now I need your

23  help on what we're going to do.  Okay.

24          What do y'all propose?  I need to enter an order.  I'm

25  going to enter an order requiring some discovery on this matter,

1    exchange of expert reports, depositions.  I need your help with

2    what I need to say.  I need help with timing and as it relates to

3    how this affects your preparations in the spring as you get ready

4    to see Judge Pitman in, I think, June.  I'll keep that in the

5    back of my mind, but I need your help on what I need to craft.

6         In other words, what I'm telling you, Mr. Goheen, I

7    respect everything you've said.  Frankly, guys, obviously these

8    are two good lawyers here and it makes this job so much easier.

9         MR. WEBER:  Thank you, your Honor.

10         THE COURT:  I appreciate the tenor of your arguments.

11   And, actually, I was impressed by how much y'all know about your

12   subject matter.  But y'all all are capable of flying down right

13   above the crops.  I'm flying up here at 40,000 feet, and for me,

14   I'm labored with this thought that this was capable of being

15   ascertained.  This information is capable of being obtained and I

16   just can't shake it.  And I recognize things could have been done

17   differently, but whatever transpired, frankly, Mr. Goheen, and I

18   jokingly said this a moment ago, it is probably what has led this

19   referral over here to me.

20         And because of that, Judge Pitman's a reasonable man

21   and a reasonable judge.  If y'all run up against time problems as

22   relates to your trial, you can file the necessary motions and I

23   think he'll hear you out, particularly understanding that this

24   matter was initially referred to for a motion on the class

25   certification.  But now we've had this hick-up and we're going to

1    -- it's going to spend more time.

2           So I'm not really -- I have -- I am optimistic you'll

3    be able to work with your trial date, I guess what I'm telling

4    you, but I want to -- I want to have kind of walk out of here

5    with no disagreement as to what needs to be done.  So I'll

6    start --

7           MR. GOHEEN:  Can I get my calendar, please, your Honor?

8    If you'll excuse me.

9           THE COURT:  Absolutely.  Sure.

10          MR. GOHEEN:  Thank you, your Honor.

11          MR. MONTS:  Judge.

12          THE COURT:  Yeah.

13          MR. MONTS:  This is Britt Monts.

14          THE COURT:  Yeah.

15          MR. MONTS:  We have Mr. Jewell in the courtroom.  We

16   brought him in case the Court had any questions about these

17   issues, and we could sort of, you know, go back and forth and

18   shuttle.  But if the Court would simply like to have him under

19   oath and just ask him what we need, he's obviously more technical

20   than any of us.  I would offer that, but obviously only if the

21   Court --

22          THE COURT:  Well, my quick sense is, you've already won

23   here this morning.  So I don't know if I'd go into that.

24          MR. MONTS:  Okay.

25          THE COURT:  Again, I'm impressed with the lawyering and

1    that extends, I'm sure, to everybody who's sitting at the tables

2    who I haven't heard from.  My guess is, I don't have to be real

3    detailed with this order.  You all can work it out, the details.

4    But what do I need to say that will help?

5           MR. GOHEEN:  Let me make one statement.  I mean,

6    Prutsman just isn't involved in this.  That has nothing to do

7    with --

8           THE COURT:  He's the bankruptcy guy, right?

9           MR. GOHEEN:  Right.  And you can't self-identify your

10   way into or out of a class.  It's as obvious -- under the law.

11   So I think he should be either ordered stricken or they

12   voluntarily withdraw him.  That's -- agreed?  I mean, that's he

13   has nothing to do with these issues that Ellsberry testified to.

14   The word "bankruptcy" never appeared in Ellsberry's deposition,

15   or exclusion, or anything else.  There's no reason to go to the

16   trouble of deposing him.  He just said it was after class

17   certification.  We're talking about whether a class should be

18   certified.

19          THE COURT:  But if the class is certified, it's one of

20   the exceptions to the class members.  Once we certificate the

21   class, I think it will be incumbent upon not your team but on the

22   plaintiffs to run those names against bankruptcy ledgers.

23          MR. WEBER:  We can do that.

24          MR. GOHEEN:  I agree.  Again, that's late.  That has

25   nothing to do with Ellsberry.  That's the untimely part, your

1   Honor.  That's totally late.  I get -- I get the whole -- but I

2   get the whole thing with Jewell because that's supposedly

3   rebutting ascertainability.  But there's nothing in Ellsberry's

4   deposition that even hinted at any of the issues that Prutsman

5   talks about.  That's just not -- that's really not fair.

6           MR. WEBER:  It was their response, your Honor, whereby

7   they attacked an exclusion to a class definition.  For purposes

8   of determining ascertainability, you're looking at the class

9   definition, which is who meets the class definition.  For

10  purposes of an exclusion -- for example, one of our exclusions is

11  those people who were member -- the judge or members of the court

12  staff, never had a case whatsoever where anybody has ever looked

13  and tried to go get a list of who's in the court because the

14  Court knows when you get -- somebody in this court living in an

15  MAA apartment, or whatever, if they got a class notice, they

16  would go, wait a second, this is a case that we're working on.  I

17  can't be involved here.  I can't get this money because we're

18  administering this case.

19          MR. GOHEEN:  But it's late.  That's the point.  Of

20  course -- I'm not done, respectfully.  Of course, the only time

21  we were going to contest ascertainability was in our response.

22  When else are we going to -- they're acting like it's a surprise

23  that we're contesting that you can ascertain the class.  That

24  does not give them license to come out with somebody who never

25  had been disclosed in any disclosure before.

```
 1              THE COURT:  All right.  I'll think about Prutsman.  All
 2   right.  Who else needs to be deposed?
 3              MR. GOHEEN:  I guess the three people, the Jewell and
 4   his two people he relied on in Atlanta.
 5              MR. WEBER:  And we would like -- as this court
 6   suggested, we would like one year worth of data so that when his
 7   people are deposed, they can say not only could it hypothetically
 8   be done but it's been done.
 9              MR. GOHEEN:  I disagree, because we need to depose them
10   on their declarations and what they know at the time, and then,
11   the Court can make the decision after that.
12              THE COURT:  Who's your IT expert?
13              MR. GOHEEN:  We don't have an IT expert that's going
14   to --
15              THE COURT:  Who runs the IT outfit for Mid-America?
16   Why don't I order him deposed?
17              MR. GOHEEN:  I don't know the name, but if that's the
18   Court's order, we'll certainly comply with it.
19              THE COURT:  I just kind of want to get to the bottom of
20   this.
21              MR. GOHEEN:  I agree.
22              THE COURT:  Is this -- can we do this or not?  And
23   we're making a -- I think we're making a lot out of something
24   that we can figure out.  I mean, I think collectively, y'all can
25   both go back and find an expert.  Yardi, I've heard of Yardi
```

1   before; it's a common program.  Can you just write some code and

2   come up with this?  We're making a mountain out of a molehill, I

3   believe.

4           All right.  Three depositions.  Do you want to depose

5   their IT expert or not?  I mean, I --

6           MR. WEBER:  I believe it would be useful, but

7   respectfully, I'm not sure -- yes.  I want that deposition, but

8   I'm not even sure that their IT expert knows exactly how to --

9           THE COURT:  All right.  Then I'm not going to do it.

10  All right.  Three depositions.  What needs to be done in advance

11  of the depositions?

12          MR. WEBER:  I would like one year worth of the Yardi

13  database so that we can run queries against it and actually

14  demonstrate --

15          THE COURT:  For all 60 properties in Texas?  Or how

16  about just the properties that the plaintiffs lived in?

17          MR. MONTS:  Your Honor, and I'll -- just because I've

18  talked with the expert.  The problem is the Yardi system is a

19  bunch of ones and zeros.  It's a database like any other

20  databases.  It's just a database, just a trademark, and in order

21  to get this data, you can't carve out part of that data system.

22  You have to have -- you have to be able to log into the system to

23  feed your query into it.

24          So what Mr. Jewell needs is access to the Yardi

25  database.  We have a protective order and we have protections for

1   even attorney's eyes only and highly sensitive information.  But,

2   again, this is a licensed piece of software that is used widely

3   around the world even.  So he needs access to the Yardi system

4   that Mid-America uses.

5           THE COURT:  Do we need to do that in advance of the

6   depositions?

7           MR. MONTS:  I think it would be helpful.  I think -- I

8   just want to know the answer.  We feel comfortable that we're

9   right.  But, again, I think the Court makes a good point that we

10  need to get to the bottom of this, and I think we would need to

11  do that before we take these depositions so that we have the

12  information.

13          MR. GOHEEN:  Then we're not deposing him on his

14  declaration.

15          THE COURT:  All right.

16          MR. GOHEEN:  He's going to have to put another report

17  in.

18          THE COURT:  We'll cross that bridge when y'all fight

19  down the road.  I'm not going to do that now either even.  So

20  three depositions.  Do you want -- any reports have to be

21  exchanged in advance of the depositions?  What do we need to do,

22  if anything, there?

23          MR. WEBER:  I believe they have the information.  And

24  we'll make arrangements --

25          THE COURT:  I mean, the other two guys, have they

1    submitted reports, the ones that were cited by Jewell?

2              MR. GOHEEN:  No.

3              MR. WEBER:  No, because these are people that he

4    reached out to.  They're not technically our experts, although

5    we've designated them as people with knowledge of relevant facts.

6              THE COURT:  You need something more than Jewell on this

7    point, in my opinion.  Jewell's your damages guy.  But I don't --

8    even he admits in his declaration he's relying on two other

9    people for the conclusions he reaches.

10             MR. WEBER:  Okay.  Then we'll identify that person and

11   produce it.

12             THE COURT:  But they have to be the two that are named

13   in Jewell's declaration, right?

14             MR. GOHEEN:  Agree, your Honor.

15             THE COURT:  Not some other person out there.  I mean,

16   we're way too late for that.  I agree with Mr. Goheen on that.

17             All right.  So what do you want from those two -- or

18   all three of them, frankly, in advance of the depositions?

19             MR. GOHEEN:  If they -- sorry, your Honor.

20             THE COURT:  That mic will pick you up, too.

21             MR. GOHEEN:  I'm just leaning as that little -- I'm

22   sorry, your Honor.

23             If they have reports, I guess I would respectfully

24   request that there be a deadline set for at least the two people

25   referenced in Mr. Jewell's report to submit something if they're

1    going to.  And whatever that deadline is, you know, November

2    15th, December 1st, whatever it is, I'm not too exercised about

3    that.  But I think it would be fair to set a deadline and that

4    gives a target date for everyone to understand that this is what

5    they've got to -- you know, this is something that they're going

6    to submit something, do it by a date certain.

7              THE COURT:  Okay.  What do you think, Mr. Weber?

8              MR. WEBER:  That's fine, your Honor.  For purposes of

9    -- I would think at least 30 days to reach out to these people.

10   I mean --

11             THE COURT:  Okay.

12             MR. WEBER:  And --

13             MR. GOHEEN:  That's fine, your Honor.

14             MR. WEBER:  -- I guess I want to -- I would make a

15   point, your Honor, you know, we seem to be addressing this issue

16   of ascertainability of can we do this.  And I would just

17   reiterate for the Court, as we've briefed not only in our

18   response here but in our motion for class certification briefing

19   repeatedly, this is an artificial test.  Even if the answer to

20   this, is you can do this, review of the tenant ledgers is

21   sufficient.  And I just want to make that point clear that the

22   cases say over and over and over again and we cite --

23             THE COURT:  A manual review of the 27,000 units in

24   Texas for four years?

25             MR. WEBER:  It's not 27,000, your Honor, because we

```
1   already --
2              THE COURT:  I think that's what you said in your --
3              MR. WEBER:  We already know from the spreadsheets that
4   have been produced, the summary spreadsheets that have been
5   produced, we already know the subset of tenants who were charged
6   the fees.  So we're already starting to limit the total pool of
7   all tenants.
8              THE COURT:  I'm just curious, what is that?  Ballpark?
9              MR. MONTS:  Problem is, the late fees are not broken
10  down.  In other words, the tenant might have paid three days late
11  so they have an initial fee and then, daily fees.  The way their
12  summary, their spreadsheets, which are thousands of pages, they
13  just show -- it's line item for each late fee, like a $75 initial
14  fee and two $10 late fees.  But it's still only one tenant and
15  one month.  So that's three line items, but it's really one
16  month's late fee for one tenant.  So we have to compress, it may
17  be 27,000 --
18             THE COURT:  Have y'all done that yet?
19             MR. MONTS:  Well, we would have to do that digitally.
20  We could take their data and we could run it by tenant number and
21  do it.  This is just data searches to do it.  They've already
22  stipulated to numerosity.  They've admitted there are thousands
23  of members of the class and that it involves millions of dollars.
24  They stipulated to that and Mr. Ellsberry testified to that.  So
25  that gets us clearly past, you know, the numerosity issue, which
```

1   they've stipulated to.

2          MR. WEBER:  And the point that I'd like to respond to

3   is -- and Mr. Goheen has used the phrase "red herring" a number

4   of times.  It's an absolute red herring.  It's absolutely

5   contrary to every case regarding ascertainability with the

6   exception of one that know of out of the Third Circuit.  It runs

7   contrary to every one of those cases to say that if you -- that

8   you have to have a one computerized summary spreadsheet to do it,

9   and if you have to look to ledgers or if you have to do some

10  work, even if there are administrative challenges in doing that,

11  that somehow that's not ascertainable.

12         THE COURT:  I appreciate that, but it sounds like

13  within the next 60 to 75 days, we're going to resolve or if not

14  resolve, we're going to get a much better picture or

15  understanding of whether or not there is code that can be written

16  that can give us the information that we want easily.  If that's

17  not the case, then we have a different issue to talk about, and

18  that is whether or not the manual review of these tenant ledgers

19  is the way to go and I'm not -- I don't have an opinion on that

20  right now.

21         So 30 days from the reports deposition -- I mean, I

22  realize we're now starting in November, we have the holidays.

23  I'm not going to press you guys.  When do you want to try to get

24  these done?

25         MR. WEBER:  I would look to Mr. Goheen's schedule on

1    that since we're addressing this issue for us.

2           MR. GOHEEN:  December -- I guess 30 days is December

3    2nd, I think.  So December 2nd, I would ask that because of the

4    holidays and we have three depositions, that we depose -- that we

5    have the depositions taken by January 15th.  Is that acceptable

6    to the Court?

7           THE COURT:  Oh, yeah.  If you said January 31st, I'm

8    okay with that, too.

9           MR. GOHEEN:  January 31st, 2019?

10          THE COURT:  Yeah.

11          MR. GOHEEN:  Nah, just kidding.

12          THE COURT:  Now you get me in trouble with Judge

13   Pitman.  I'm going to go ahead and say January 31st.

14          MR. GOHEEN:  Thank you.  I was going to say.

15          THE COURT:  2018, if y'all could get it done

16   beforehand, super.

17          MR. WEBER:  Judge.

18          THE COURT:  Let Mr. Goheen finish.  Go ahead.

19          MR. GOHEEN:  I would ask that they be produced in

20   Atlanta, your Honor.

21          THE COURT:  Yeah.

22          MR. GOHEEN:  I do think that's an acceptable backup.

23          THE COURT:  That we'll do, okay.

24          MR. MONTS:  I think one of these witnesses is in Dallas

25   and Mr. Jewell is in Austin, but he seems to want to put a W on

1    his column, so we can accommodate that.

2            THE COURT:  That was a little stab right there, wasn't

3    it?

4            MR. MONTS:  I'm joking.

5            MR. GOHEEN:  They made us come to -- they made Mr.

6    Ellsberry come to Austin when he's in Memphis.  I thought

7    turnabout's fair play to me, but go ahead, Mr. Monts.

8            MR. MONTS:  Well, I think what I wanted to say was in

9    order for Mr. Jewell to be deposed to give useful testimony, I

10   think your idea was well taken about his ability to access the

11   MAA Yardi system under the protective order and do the search for

12   the two properties.  We can send out discovery.  We have no

13   discovery cutoff.  We're well within that.  We can send out

14   discovery like now and let the 30 days pass for them to respond

15   and allow him access just for those two properties to see if he

16   can write a query to see if he can extract the data; then when

17   he's deposed by Mr. Goheen, then he's prepared the answer all the

18   questions that this court will want.  The problem I see is, if we

19   depose him before he can do that, then we're sort of, again,

20   dancing, you know, in the dark.  We can't really --

21           THE COURT:  But is Mr. Jewell going to be the man that

22   gives us the testimony that we want here?  I mean, again, he

23   cited two other people that were the ones who were --

24           MR. MONTS:  Yes.  It may be Mr. Vimal Vichhani, the

25   Yardi specialist.  I mean, yes, Mr. Jewell is an expert on

1    databases and this is just a particular database.  But yes, Mr.

2    -- but Vichhani is -- you know, works on the Yardi systems

3    specifically.  May they would both be involved in that.  But.

4              THE COURT:  You know, it was an idea I had, but Mr.

5    Goheen doesn't want to do that right now and I'm not going to

6    make him do it.  So.

7              MR. GOHEEN:  I pulled this up, your Honor, because I've

8    got the scheduling order and I want to make sure.  Their -- so it

9    says, all parties asserting claims for relief shall file their

10   designation of testifying experts and serve on all parties, blah,

11   blah, required by 26(a)(2)(B) by January 15th.  And then, the

12   response or rebuttal experts by February 16th.  And I guess I'm

13   -- I'm thinking out loud, which is a dangerous thing for me, but

14   should we think about adjusting those dates now or -- I don't

15   know.  I'm throwing that open to plaintiffs' counsel and the

16   Court.  You know.

17             MR. WEBER:  I think given where we are, there's going

18   to be have to be a reasonable modification of the scheduling

19   order.  And I would agree that we work with Mr. Goheen to come

20   back to the Court with some suggestions.

21             THE COURT:  Yeah.  No.  I appreciate your pointing that

22   out.  It's a really good point.

23             Things are probably going to be moving.  Here's what's

24   going to happen.  Y'all are going to do these depositions by the

25   end of January.  I'm going to allow you to supplement the motions

1    for class certification and responses.  Now we're into -- that

2    will put us into February and now we're into March.  We're going

3    to be banging up against your other dates.  I'll talk to Judge

4    Pitman.  And at some point, we'll probably all get together again

5    on that motion for class certification, and at that time, we'll

6    address the future.

7              Does that seem reasonable?

8              MR. GOHEEN:  Yes, your Honor.  Thank you.

9              And your Honor raised a point I guess I did also want

10   to make, and that's what do we call it, sur-replies or

11   supplemental submissions, I don't -- I think it's necessary as

12   your Honor just pointed out.  But, again, I don't have

13   necessarily an idea about when and how that should proceed, but

14   thought it might be good that we work that out while we're here.

15             THE COURT:  Yeah.  No.  I think you're right.  All

16   right.

17             Let's require the plaintiffs to supplement by

18   mid-February.  I mean, after y'all take this testimony, I assume

19   I'm going to get something that says here's what these people

20   said.

21             MR. WEBER:  Yeah.  I think early February.

22             THE COURT:  All right.  February 8th.  If you'll file

23   your supplement, and then, a week later, can you file your

24   response?

25             MR. GOHEEN:  Yes, your Honor.

1          THE COURT:  Okay.

2          MR. WEBER:  Just so I understand it, are we -- even by

3   February 8th, are we still not going to have -- I mean, we have

4   -- I want to roll back.

5          We tendered multiple requests for production asking for

6   all of this information.  I mean, that was the fight in front of

7   Judge Pitman that they had to turn over all this database stuff.

8   They had to give us all of this.

9          THE COURT:  What did he order?

10         MR. WEBER:  That was back in the spring.  We went to

11  him and the defendants squawked and said, until class

12  certification, don't make us turn over all of this.  And we said,

13  what do you propose?  And they said, we'll give you summaries.

14  We won't contest numerosity.  We can identify these people.  And

15  now I feel like, again, we're being asked to fight in a dark

16  room.  Mr. Jewell and our folks aren't going to get discovery.

17         And the only reason we got here, Judge, the only reason

18  we got here is they didn't contest this.  And if by February 8th,

19  I'm still having to submit things to the Court and I still am

20  locked out and I don't get access to the database and I don't get

21  to run my queries and I don't get to demonstrate for this court

22  that this is easy and it's not impossible, then I'm still

23  fighting.

24         THE COURT:  Yeah, but if your experts are as good as I

25  hope you think they are, they should be able to handle a

1  withering cross-examination at a deposition and be able to stand

2  for the proposition that this is ascertainable, and then, you're

3  in good shape.  My other response to that is, if your class is

4  certified, I'm going to order them to give you what you want.

5  Now, is your June trial date going to happen?  Maybe, maybe not.

6  That's Judge Pitman's call.  If I was guessing, I'd say no.

7          So we're going to get there and if you've got the case

8  you think you do, it's just the damages are going up the longer

9  this goes on.  So I hear you.  I know you're frustrated, but it's

10  one of the -- it's just one of the down sides, frankly, of

11  kicking things over here to the magistrate side.  It just slows

12  things down a little bit.

13          MR. WEBER:  I'm not worried about the slowness, your

14  Honor.  I'm just worried -- it troubles me that we, I believe,

15  justifiably relied on what the defendants said in working and

16  accommodation in regard to discovery requests in front of Judge

17  Pitman.  And now I feel like we're getting stabbed because we

18  reached an agreement with defendants -- not this counsel, prior

19  counsel -- that we reached agreements with defendants and I'm not

20  getting the information.

21          Only reason I don't have that database now, the only

22  reason I don't have it and Mr. Jewell hasn't already run that and

23  I'm not handing you reports to demonstrate that Mr. Ellsberry is

24  incorrect in what he says, the only reason that's not happening

25  is because we agreed that this was a nonissue back in the spring.

1          But I understand the Court's admonition.  I appreciate

2   what the Court's done today.  And we will make a timely

3   supplemental response by February 8th, your Honor.

4          THE COURT:  Okay.  Mr. Goheen, do you have the need to

5   designate an expert in opposition to this?

6          MR. GOHEEN:  That's a good point, your Honor.  Sorry.

7          I guess I would at least want to --

8          THE COURT:  I'll leave it open then.

9          MR. GOHEEN:  Leave it open.

10          THE COURT:  You need to file a report within the 30

11   days, as well, if you're going to do -- and designate somebody.

12          MR. GOHEEN:  Understood, your Honor.  I understand.

13          THE COURT:  Okay.

14          MR. GOHEEN:  And thank you, your Honor.

15          THE COURT:  Sure.  Well, it feels like a typical

16   hearing.  I think everybody's walking out of here feeling like

17   they didn't get what they -- exactly what they wanted.  I don't

18   know if I did anything right or wrong.

19          But the bottom line is, I think we're going to get a

20   lot closer down the road to whether there is ascertainable.  I

21   appreciate, Mr. Weber, your thought that it would be nice if you

22   could get the database now and -- because I think you're right.

23   If you had the database, we could figure this out real quick.

24   But if your experts have familiarity with Yardi with other

25   businesses, maybe it's not late fees, maybe it's some other

1  credit against cost of goods sold, or whatever that may be,

2  that's going to be persuasive to me.  If they have analogous

3  experience with Yardi as it relates to the ability to glean

4  credits, waivers, those type of things, that's going to be

5  persuasive, okay?

6          All right, everyone.  Hold on a second.  Okay,

7  everyone.  Thank you.

8          MR. GOHEEN:  Thank you, your Honor.

9          (Proceedings conclude at 10:10 a.m.)

10

11

12

13                  REPORTER'S CERTIFICATE

14

15    I, LILY I. REZNIK, DO HEREBY CERTIFY THAT THE FOREGOING WAS

16  TRANSCRIBED FROM AN ELECTRONIC RECORDING MADE AT THE TIME OF THE

17  AFORESAID PROCEEDINGS AND IS A CORRECT TRANSCRIPT, TO THE BEST OF

18  MY ABILITY, MADE FROM THE PROCEEDINGS IN THE ABOVE-ENTITLED

19  MATTER, AND THAT THE TRANSCRIPT FEES AND FORMAT COMPLY WITH THOSE

20  PRESCRIBED BY THE COURT AND JUDICIAL CONFERENCE OF THE UNITED

21  STATES.

22

23  /s/Lily I. Reznik                    February 1, 2018

24  LILY I. REZNIK                       DATE

25